The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Please be seated. Good morning, ladies and gentlemen. Before we begin, I'd like to introduce and welcome Judge Virginia Kendall of the District Court for the Northern District of Illinois. We're very pleased to have her with us and we welcome her. We have six cases on the calendar this morning. Three patent cases. One from the District Court, another one from the District Court on design patents and one from the PTO. We have two employee cases. We have a case from the Court of Federal Claims, a bid protest case. The patent office case and one of the employee cases are being submitted on the briefs and will not be argued. Our first case is Alec and Barry Wood v. Pergo, 2009-11-07. Mr. Dunner. Good morning, your honors, and may it please the court. I'd like to start with two issues which I would like to characterize under the title trial by ambush. It deals with the enablement issue and question 12 in the verdict forum. Let me start with enablement. Just so I can understand the posture of this. If you were to lose on the obviousness question, that would take care of everything in the case, would it not, except for the inequitable conduct issue? I believe that is correct. Okay. I hope at some point you're going to spend some time on obviousness. I will get into obviousness pretty quickly. Okay. But let me first deal with this issue, the enablement issue. Alec's expert did not take any position on enablement. There was nothing in his report on it. He said he didn't have a view on it in enablement. They asked Pergo's expert. He said he didn't have a view because he wasn't asked to opine on it. Nevertheless, Alec says all you need to do is look at the spec and find there's no enablement. Mr. Dunner, I don't want to interrupt your argument, but I, too, am especially interested in the obviousness issue. And I would prefer if you direct your first comments to that issue. And I would like you to address the Morial patent, if that is the proper pronunciation. I believe that is the correct pronunciation. The Morial patent comes up only in connection with question 12 in the verdict form. That's one of my trial by ambush points. The jury found specific combinations based on four patents. And those four patents did not include Morial. The only basis for Morial was question 12. And we submit that question 12 is not a proper basis that doesn't provide substantial evidence and or are entitled to a new trial on it. The references on that list were never applied against the claims, including Morial. The references were never analyzed. They were just included in the record. In other words, you're objecting more to procedure than substance. We're not, Your Honor. We're saying there is a case, the Kaleido case, and the InnoGenetics case, both of which focused on whether or not, and Kaleido was a JMOL case. They focused on whether or not there was any direction given to the jury in connection with references. The InnoGenetics case involved a list of references and with no analysis based on the list. The party just said a person of ordinary skill in the art would know how to deal with these references. And in each case, the court found it was improper. And we submit it's improper here. It's improper under KSR or any other case to just throw reference, put them into evidence, throw them to the jury. Question 11. The jury found the specifically stated references render the claims obvious. The question 11 involved four references. And our position is, backed by what I submit is sound reasoning, that the references themselves teach away from the combination. Just to be clear here, you only are making specific arguments with respect to claim 12 and claim 32, right? You're making arguments that they fail to have expert testimony with respect to the other claims. But the only ones in which you focus on the particular problems are 12 and 32, right? That is correct, Your Honor, 12 and 32. And with respect to 12, Weber... Weber and Woodhen. Yeah, so the real question is, was there a motivation to combine Wood with Weber, right? Yes, and we submit there clearly isn't. The whole purpose of Weber was to have a foam core. And the foam core was selected so that it could conform to the undersurface of a floor. And it did away with the need for sand underpinning so that the floor would conform to the overlaid panels that were put on top of it. And we submit that that teaches away from substituting wood, which is what Weber distinguished from. Weber mentions wood right at the beginning of the patent and says it's no good. We submit that's improper. The same is true of an attempt to combine a couple of other references, which have the same problem. And that, for the same reason, there's a teaching away. There's another combination of references in which one of the references is Baker. Baker deliberately permits play to exist so that you have expansion possibilities. They're trying to combine that with references teaching a tight joint, which is exactly contraindicated... That's 32, not 12, isn't it? That is 32, correct. Weber-Woodhen book is 12. And I submit that those references teach away from their being combined. Isn't your argument with respect to enablement of claim 32 inconsistent with the notion that the prior art wouldn't teach a tight fit? No. My argument on enablement is there is no evidence on enablement, period. There's just no evidence. But you're saying, well, but aren't you also saying that 32 is enabled because people would have known how to make a tight fit? And if that's true, why wouldn't that carry over into the obviousness analysis of 32 so that people would have known how to make a tight fit when combining these references? Your Honor, because my claim 32 argument is key to a combination of two references. And the suggestion is that whatever the suggestion is, let's modify Baker to make it a tight fit. I'm saying whether people know about tight fit or don't know about tight fit, Baker says, we don't want a tight fit. So I don't see how you can combine references, whether it's based on knowledge of a person skilled in the art, based on how to make a tight fit, or otherwise. When Baker says, I don't want a tight fit, I want play, I want the panels to be able to expand in warm weather or in humid weather, I say that contraindicates combining it with the tight fit. It makes no difference whether it's obvious or not obvious to have a tight fit for that reason. Now, if there are any other questions on obviousness, I'm glad to deal with them. But if not, I will go into infringement. The infringement issue... How is it that we ended up with the jury making the claim construction here? Both parties seem to have agreed to that, right? It was kind of odd. Your Honor, there were claim constructions that were made, and the court instructed the jury as to certain claim constructions. It did not, and it instructed on tongue, but it went only so far. But you both agreed to give this question to the jury as to how they were constroying the claims. I don't understand that. Your Honor, the reason for that is, that's question 3F. 3E questioned whether there was a tongue on the accused's devices. 3F said, what is the basis for your analysis of tongue? That was a check on the jury to make sure that the jury applied the proper claim construction. Now, I submit... You gave them alternative claim constructions in 3F. That's right, to make sure... Why? I mean, that's not the jury's function. Why did both sides agree to do that? Your Honor, I don't know why they both agreed to do it. All I'm saying is that it serves a function. If all you have is a black box, and if all you ask the jury is, is there an infringement, then you don't know what the jury thought. You don't know what its analysis is. If you ask the jury, does the accused device or accused devices have a tongue, and then you ask them another question, how are you analyzing tongue, you then have a basis for challenging. Otherwise, I would not be able to challenge. I don't think that's a real answer. I mean, the court is supposed to tell the jury what the claim construction is, not to give the jury two alternative claim constructions, and ask them to choose one or the other. That's very strange. I don't understand how this happened. Your Honor, it may be strange, but it happened. All I'm suggesting is the jury did give them a claim construction on tongue. He said it's the portion of the panel that is designed and made with the groove of an adjacent panel. And they went ahead, having taken the position in the Markman hearing that the tongue was the entire side, not just the piece that extended beyond the top edge. And with us having taken the same position, there was no basis for embellishing that. During the trial, they went ahead and they took the- Did you object to the jury being given these alternative claim constructions? No, we did not object to it being given the alternative claim construction. And all I'm saying is it performs a function. Wise or not wise, it performs a function. The function is, did the jury follow the testimony and the arguments of Allock, that it's only the piece that extends beyond the top edge, or did it follow the evidence that showed that Allock took the position in the Markman hearing, we took the position in the Markman hearing, the patent is replete with references to tongue seven and groove six. There is no reasonable way, I submit, that one can construe that term otherwise, unless you look at extrinsic evidence, to be sure there was extrinsic evidence. And that's what Allock is relying on. One of the inventors, Kulik, circled the edge, the little part that projects above the top edge, and said, that's how I use it in my daily work. And then they had a parade of other witnesses who basically said, that's how they use it in their daily work. The issue is not how they use it in their daily work. The issue is, what does this patent say? You cannot read this patent without concluding that the tongue is the entire element, which includes protrusions not only beyond the top edge, but which includes protrusions inward of the top edge. And in fact, the construction that the jury gave wipes out all the embodiments in the patent, all of which have protrusions on the forward of the top edge and rearward of the top edge. But then why did you let that go to the jury? Because that intrinsic evidence should have been not brought in, if your theory before the court is that it is set forth within the patent, the 970 patent itself. Your Honor, I imagine that objection could have been made to that extrinsic evidence, but the case law doesn't preclude extrinsic evidence. The case law merely says that extrinsic evidence can't trump intrinsic evidence. And I'm relying on the intrinsic evidence, the Markman hearing, the patent itself. And all I'm saying is that that evidence, if it is inconsistent, and I submit it's not even inconsistent because it says that's how they do it in their daily work. How they do it in their daily work should not trump the intrinsic evidence, even if it was admissible. And all I'm saying is the case law doesn't forbid use of intrinsic evidence. It just says that you can't let it overwhelm the intrinsic evidence. But it should have been for the court first, right? The interpretation should have been done by the court. Your Honor, the court basically said that, in fact, on A1391 and 2, the court said, on the matter of tongue, I think everyone understands the patent says one thing. Lay witnesses, depending on the context, have something different. So the court told the jury that it's the patent that counts. You should have objected. You should have said, no, this claim construction issue doesn't go to the jury. The judge has already construed tongue. You know, don't do this. And, you know, when you get into a situation in which there isn't an objection like this, there's a waiver issue. Your Honor, I don't know that there is a waiver issue in terms of we did challenge it. It's clear that there was a challenge based on this. The fact that the question went to the jury doesn't create a waiver situation. As I said, it provides a check on whether or not the jury followed the court's guidance. And the court gave them guidance on tongue generally. And there was evidence as to what the patent said. And so the jury was given a question, which is not irrational. You're suggesting that perhaps the lawyers should have done differently. But it is not an irrational question. Perhaps that it's forbidden to give the jury a claim construction. We've made that clear. It's forbidden. It's for the court to do the claim construction. Your Honor, the court did give them a claim construction issue defining tongue in the jury instructions. And then the question was posed to the jury as a check to see. if the jury used the right evidence to satisfy that claim construction. The court did give a claim construction on tongue. It didn't abdicate completely. It gave a construction. And there was evidence as to what was said at the Markman hearing. There was evidence as to what the patent taught. And the question was, did the jury follow? And in fact, the judge told them. The patent says one thing. Lay witnesses have something different. Quite the implication of that is follow the patent. Mr. Dunnett, tongues have been very active here so far. And your time has been consumed. We'll give you your three minutes back for rebuttal. And let's hear from Mr. Roach. Okay, thank you. Good morning, Your Honors. May it please the court. I agree with you that validity is the key to this case. And because it can avoid the need to get to these rather sticky issues. How did this claim construction issue define the jury? I mean, it's just wrong. You're not supposed to do that. I understand your point. But I think that this court has said that a claim construction does not have to be avoid all ambiguity. This judge was presented originally with our argument that based on the first patent, which has an earlier filing date, and which doesn't show any of these protrusions other than on the tongue. In the original patent, all the protrusions are on that part which sticks out from the edge. But also in that earlier patent, the only thing that's shown is a separate piece glued to the edge. And that's what they called the tongue and the groove in the first patent. So my position originally was. You're not really answering how. I mean, here the judge gave a claim construction of tongue. And then there are two subsidiary claim construction of tongue that are offered to the jury. And the jury is asked to choose between the two of them. That's not the jury's business. Well, the judge adopted Pergo's proposed construction. They had proposed the following. In fact, this is from A180, which is first claim construction ruling. The court therefore rejects Alloc's construction, which was separate pieces glued to the edge, and adopts Pergo's construction that a tongue is a portion of the panel that is designed to mate with a groove. I understand what happened. I don't mean to consume all your time. Yeah, it's just, you know, the judge was resistant to engage in continuing and never-ending construction. We went back to him three times. And at some point he said, that's it. I've done what I think is enough. And the jury was asked, where is the protrusion? Is it on a tongue or not? And the judge also instructed the jury to use the ordinary meaning for terms that were not explicitly construed. And that's what we think happened here. We don't think that the jury actually engaged in construction. Well, I mean, it says some line drawing can be done. This is Acumet versus Stryker. It says, some refinement of lines. It says, what criteria did you use? Pardon? It said the question 3F is, what criteria did you use? And it offers them two alternatives. The tongue includes the tongue side of the panel. The tongue includes only the part that extends outwardly from the upper edge. I mean, they've given a choice. I don't know. Well, I agree with you, Judge, that they did not object to this. They knew that we were arguing from the beginning that we did not have a protrusion on our tongue. You're both at fault.  You're both at fault for submitting this to the jury. Well, we'll take the result that we both waived the issue to complain about the claim construction. If they were wrong in addressing the claims construction on the tongue issue, how does it impact the jury's verdict on the non-infringement on the other claims is really the question then, if we were to not address the tongue issue? We've got non-infringement reasons other than that. The forcing together limitation is also a claim construction issue, but it's all about the word when. And I think that that's clear. And I don't think, but I don't think we have to get to either of those issues, because we've got validity in spades here. We've got validity, getting to the morale patent. The file history is in the record here. The file history shows that the examiner rejected the claims of the 970 patent on the basis of the morale patent. And Provost's only response was, it's not applicable prior art because we have an earlier filing date. They have not chosen to appeal the filing date ruling that they only get from August. You'll see here, they did not appeal. So morale is not one of the references relating to Claim 11. And Claim 12, Claims 12 and 4, it was buried in a whole list of other references. Well, we did not specifically submit an interrogatory to the jury on that. That's true. In other words, you didn't think it was a very good reference. Well, there's a lot to do. And we ran the risk of boring the jury to death and going through all of these references and all the detail. I mean, our expert went through this, and his exhibits that he used, that he used to walk through these references are in the record. There's probably a law of obviousness, if I can state it correctly, that the relevance of a reference is inversely proportional to the number of references submitted with it. Well, that may be as a general rule. But we have so many references here we could have used. But the point I'm making is that the Morio reference was relied upon by the examiner at the very beginning of the question. The problem is it doesn't seem to have been relied on by the jury. Well, but it's in the record, and you can rely on anything in the record. The examiner, the only response to the rejection on the morale. So you're telling us to say it's a matter of law, it was obvious, and to make our determinations as to the underlying fact issues? Well, the question is, is there substantial evidence in the record? That's the question. And I think not only is there substantial. So that's not the question if the jury didn't make a determination. Only jury determinations that were actually made are tested by the substantial evidence standard. We also asked the inventor, Mr. Kulik, about the Unilin product. And he acknowledged that the Unilin product had everything in claim one, including tight. He was also asked about whether the Alloc product that he had seen in 96 had everything in claim one of the 970 patent. And he said it had everything except tight. But tight is not a requirement for these claims. And so there's another couple of examples of things in the record brought out through the testimony of Mr. Kulik. The Feeble Lock product is another one. The judge excluded the actual samples of the Feeble Lock product, but we have the Feeble Lock literature in the record at A10085, and the brochure for that product, which is dated 1999, is 10293. In our brief, on page 27 of our brief, we compare the Feeble Lock product, which is an early version of the Accused product. It's almost exactly the same as the Accused product, except we removed the slanted locking service and made it vertical. That Feeble Lock product was studied by the inventor in 1999, and they're stuck with the filing date of August 2000. So the Feeble Lock product, which is essentially the Accused product, that which infringes afterwards anticipates it before. That's the Feeble Lock product. We have the whole derivation basis for invalidity. A derivation is essentially anticipation. Anticipation with some corroboration here, which we had also in spades. We had Mr. Pervon, who had gone to Pervo in 1994, met with their entire R&D department and their patent council. Pervo's response to that was, oh, we're not interested. But what did they do? They created a project codenamed Pervon, and project codenamed Pervon is what resulted in these patents. Mr. Pervon came to the trial and testified, and not one Pervo person, not one from their R&D department, came and rebutted whatever he said. Their entire R&D department met with him. If anything that he said wasn't accurate or true, where was the Pervo witness to deny that? They didn't come. The derivation argument, I think, not only takes care of these, the 970 claims, but because his PCT application specifically says how to make a joint watertight. It says use a rubber strip if you need to. That's not glue. These claims say without glue. But a rubber strip would make this invention or make a joint watertight. That's what Mr. Pervon came and testified. He said in his memorandum that he said to them before the meetings, he pointed out that we understand that you want to make a joint that's water resistant. We can teach you how to make the joint that is moisture proof. Nobody from Pervo came and said that's not what he really told us. He went through everything that he'd said and that's a problem for them. We get not only the PCT publication to rely on, we get everything that he said because it was unrebutted. That's what derivation is. They can say that our Pervon PCT application doesn't show a tight joint. I think it does. Tight was defined by the court as holding water for three hours. That's a rigorous definition of tight. He did that based on the 970 specification. They accepted that. They have not challenged the judge's ruling on what tight means. What that means is that's a high bar for us to meet both for invalidity, but it's also high for them to meet on infringement. They want to say that the Pervon PCT doesn't show a tight joint. Granted, the figures are showing a loose joint because he preferred that. He'd rather have it loose and readily assemblable than too tight. In the specification, it is pointed out that if you want to make it water tight, you use a rubber strip. This is at A5078, and in the claim of the published PCT at 5085, we claim a rubber strip. Now, we believe that Peyote, because it's rubber, suggests that's how you make something waterproof, as the judge defined it in its rigorous way. There's nothing in this specification about how to make something that will actually hold water. They're sort of betwixt and between. Either they lose on enablement because they haven't shown anybody how to make something this watertight, or if they want to live by the looser standard, then this prior art certainly is substantial evidence to meet the obviousness standard. Or in the case of the PCT, the Pervon derivation argument, it perfectly teaches how to make a tight joint, and his corroboration is clear. So our view is- Mr. Roach, you are into the amount of time you wanted to save for your cross appeal. You can continue, but if you save it, of course, you can only use it for your cross appeal. I would like to save it. And if it is something, it would be rebuttal. So there would have to be something to rebut. So whether you use it or not, you can weigh all your options. I understand. I think I've said enough for now. Mr. Donahue, you have three minutes in rebuttal. Let me mention one thing about the Moreo patent. Their expert said he was not relying on the Moreo patent, which is still another point. Not only was it included in this long list, but on A1386, their expert expressly said he wasn't relying on it. A council relied on the Unilin product. The Unilin product, there's no evidence where it was sold. For all the record shows, it was sold in Europe. It is not prior art. The council mentioned the Fibolock product and talked about patent literature. We looked at the patent literature. It's at 10289 and 10293. It has no dates on it, and I suggest it is not prior art. As to the derivation point, I would note on tight joint that Darko Pervan admitted that what he disclosed to Pergo, the Pergo people, was not watertight. He admitted it. The sites, I'll just give you the sites, are 1319 and 1326. Also, the other basis for finding that there's no derivation is the forcing adjacent panels together. We submit, and we explained it in great detail in the brief, that you look at the assembly during the process. The present tense is used, and not after the process. And if you use during the process, there is no evidence that anything was given to Pergo during the process. I believe that basically is it. I was prepared to rebut the inequitable conduct point, but since there's nothing to rebut, unless you have some questions, I submit. Thank you, Mr. Donner. And as you just heard, Mr. Roach, there's nothing to rebut. So the case will be taken under advisement.